Melinda JONES, etc., et al., Appellants,

v.

HUTCHINSON MANUFACTURING, INC., et al., Appellees.

Court of Appeals of Kentucky.

June 15, 1973.

As Modified on Denial of Rehearing Sept. 7, 1973.

---

J. D. Ruark, Tom D. Harris, Morganfield, for appellants.

Clarence Bartlett, Bartlett, McCarroll & Nunley, Owensboro, J. Quentin Wesley, Wathen & Wesley, Morganfield, for appellees.

REED, Justice.

This is a product liability case. The issue is whether the manufacturer of a grain auger, an item of farm machinery, is subject to liability for negligence or for using an unreasonably dangerous design of its product in the factual circumstances presented.

Richard Jones, a farmer and father of two infant girls, Melinda, age 5, and Melissa, age 7, contracted with Adamson to harvest a corn crop on Jones' mother's farm. Adamson furnished the combine, two dump-bed type trucks and the auger type grain elevator. On the occasion of the accident in October 1968, Jones assumed charge of the operation of the trucks, the grain auger, the tractor that operated it, and the unloading process; he was assisted by Adamson's 15-year-old son. Jones allowed his two young daughters to ride upon a load of corn in the bed of a dump truck. Jones stated that he backed this truck up to the hopper and told his children to get down from the truck; they replied something he did not understand. Jones then left the truck and went to the rear of the grain bins and activated the scatterer, which was located on the bins; then he started the tractor, which was attached to the grain auger and elevator. Jones said he walked to a point near the left rear

of the truck and sat down on a five-gallon can to direct young Adamson, who was then in the cab of the truck, in raising the front end of the truck to permit the corn to run out a trap door located at the rear of the truck. Jones stated that he looked on the corn for the children but did not see them.

When all the corn had gone into the auger except some which had lodged in the corners of the truck bed, young Adamson went into the truck bed to shovel out the remaining corn. At this time, he saw the children standing on the truck bed holding to a chain that connected the two sides of it. For some reason Melinda, the five-year-old, let loose of the chain and slid through the trap door onto the grain auger. The auger tore off her left foot and part of her left leg before Jones could remove her from the machinery.

Melinda Jones, the plaintiff by her next friend, sued the manufacturer of the auger, Hutchinson Manufacturing, Incorporated, and its local retailer who had sold the auger to Adamson. The manufacturer and the retailer brought in Melinda Jones' father, Richard Jones, as third-party defendant. Without detailing preliminary procedural skirmishes, we deem it sufficient to say that the trial judge disposed of the action on summary judgment based on the evidentiary material submitted by the parties. The trial judge concluded: (a) the action could not be maintained under the so-called "strict liability" theory because this state had not extended this doctrine to bystanders who were not consumers of the product that was the alleged cause of the harm; (b) the action, insofar as it was based on negligence, was not maintainable because Richard Jones' negligence was a superseding cause of the harm, which under the circumstances presented insulated the manufacturer and its retailer from liability for negligence as a matter of law. Judgment was entered dismissing the suit, and Melinda Jones appealed. The appeal contends that we should extend the doctrine of strict liability to protect bystanders and that we should hold that the action should be submitted to a jury under both the doctrines of strict liability and negligence and that the issue of whether Richard Jones' negligence was the sole legal cause of the harm should be submitted to the jury.

The auger was guarded by three one-half-inch iron rods running lengthwise and spaced three and one-fourth inches apart. The plaintiff admits that the design in question has been continuously used in the industry since at least 1962. No witnesses claimed ever to have seen a grain auger that was designed or constructed differently. The plaintiff introduced evidence that two adult farmers in the neighborhood had been injured when their feet were caught in a similarly guarded auger. Adamson said that after the accident he placed a protective shield over the auger and the machine operated satisfactorily.

The plaintiff's expert opinion evidence consisted of the statement of a professor of agricultural engineering who was a safety engineer. The expert said that from his examination of the auger it was his opinion that the plaintiff's injury was caused by the failure of the manufacturer to adequately shield the auger; this expert further said that in his opinion the manufacturer could have manufactured and provided a shield to prevent hands and feet from getting into the revolving auger. He also stated: "A grid shield could be constructed in such a manner as to cover the hopper and so constructed as to be 4 inches above the auger flights and to extend 5–6 inches above the end of the auger tube. Additional rods could be spaced between the rods now attached to the open end of the auger. Use rods spaced at 1½ inch, but arched so the rods are 4 inches, from the edge of the flight of the auger. The lower rods need not be arched, but the rods on the sides and top should be." His conclusion was that this design would protect the feet and hands of the user or anyone in the vicinity of the auger while it was in use without interfering with the

function and satisfactory use of the auger, which would operate properly with his recommended design whether the grain handled was dry or moist.

The manufacturer produced several experts who deposed that the auger in question was designed and constructed as all others are designed and constructed throughout this country and in other parts of the world. According to these experts, it had been found that shielding or guarding more than was done by the design of this auger, impairs the efficiency of the machine and makes it undesirable for the purposes intended.

It appears, therefore, that we are confronted with the first case of alleged deficient design of a product by a manufacturer since we adopted the so-called doctrine of strict liability as enunciated in section 402A of the Second Restatement of Torts in Dealer's Transport Co. v. Battery Distributing Co., Ky., 402 S.W. 2d 441 (1965). An additional element relevant to our consideration of the problems raised is that aside from our 1965 adoption of the strict liability concept we have previously subscribed to the general view espoused in section 395 of the Second Restatement of Torts that a manufacturer is subject to liability to those whom he should expect to use his product or to be endangered by its probable use where the product is made under a design which makes it dangerous for the uses for which it is manufactured. See Herme v. Tway, Ky., 294 S.W.2d 534 (1956), wherein we approved application of the standard of reasonable care to the manufacturer under the generalized statement of Section 395 of the Second Restatement of Torts. Section 398 of the same work is a special application of the general rule contained in Section 395. Under Section 398 the standard of conduct required is to "exercise reasonable care in the adoption of a safe plan or design."

Section 402A of the Second Restatement expresses the so-called "strict liabili-ty" principle in terms of a product "in a defective condition unreasonably dangerous to the user or consumer or to his property." Prosser, the principal draftsman of this section, says in his treatise that a product is "defective" for purposes of application of the strict liability principle when it is made according to an unreasonably dangerous design. Prosser, Handbook of the Law of Torts, section 99, page 659 (4th Edition 1971).

In the same treatise, the author makes the following statements we deem applicable to the case at bar:

"There are, in addition, two particular areas in which the liability of the manufacturer, even though it may occasionally be called strict, appears to rest primarily upon a departure from proper standards of care, so that the tort is essentially a matter of negligence.

 "One of these involves the design of the product, which includes plan, structure, choice of materials, and specifications. There is no doubt whatever that the manufacturer is under a duty to use reasonable care to design a product that is reasonably safe for its intended use, and for other uses which are foreseeably probable. The question turns on what is reasonable care and what is reasonable safety. The maker is not required to design the best possible product, or one as good as others make, or a better product than the one he has, so long as it is reasonably safe. But the fact that others are making a similar product with a safer design may be important evidence bearing upon the defendant's reasonable care. Likewise the fact that others make use of the same design is evidence for the defendant, although it is not always conclusive." Prosser, Handbook of the Law of Torts, section 696, page 644 (4th Edition 1971).

 We think it apparent that when the claim asserted is against a manufacturer for deficient design of its product the

distinction between the so-called strict liability principle and negligence is of no practical significance so far as the standard of conduct required of the defendant is concerned. In either event the standard required is reasonable care. Hence, it is unnecessary in this case to consider whether Section 402A extends to "bystanders." If the manufacturer failed to observe the standard required, he is subject to liability to those whom he should expect to use the product or to be endangered by its probable use under the principles of Section 398. Section 402A imposes possible liability only upon failure to observe the same standard of conduct where the claim is for deficient design of the product. Therefore, in deficient design claims the "bystander" or "nonconsumer" or "nonuser" problem resolves itself.

The evidentiary material introduced by the manufacturer was to the effect that all expert designers in the industry designed grain augers in the same manner as was done in the case of the auger in question. Product design is a function that is in part, at least, subjective though governed by principles which are part of a body of learning that has developed through experiment, testing, and experience. The uncontradicted evidence is that the design involved was regarded by the industry as the safest possible under the circumstances to achieve proper functioning of the product. We think this situation is different from that presented where an entire industry or part of it customarily fails to do that which is known and available and practicable.

In an annotation, Products Liability—Duty as to Design, 76 A.L.R.2d, 93, 94, the annotator comments that there is not a great deal of decisional law on the problem of the manufacturer's duty as to product design. According to this annotation, there are two fundamental rules applicable: first, the duty is one of reasonable care, under the circumstances; second, neither a manufacturer nor a seller is an insurer that his product is, from a design viewpoint, incapable of producing injury. "Farm machinery cannot be accident proof. It is a matter of common knowledge that injuries frequently occur in the operation of mowers, threshers, corn shellers and similar equipment." Anno.: Products Liability—Machinery—Tools, 78 A.L.R.2d, page 604.

We agree that if an industry adopts careless methods, it cannot be permitted to set its own uncontrolled standard. Herme v. Tway, Ky., 294 S.W.2d 534 (1956). If the only test is to be that which has been done before, no industry or group will ever have any great incentive to make progress in the direction of safety. We also agree, however, with Prosser's declaration that: "Cases will no doubt be infrequent in which any defendant will be held liable for failing to do what no one in his position has ever done before; but there appears to be no doubt that they can arise." Prosser, Handbook of the Law of Torts, section 33, page 167 (4th Edition 1971).

Where common knowledge and ordinary judgment will recognize unreasonable danger what everyone does may be found to be negligent. In the case at bar, common knowledge is that injuries frequently occur in the operation of farm machinery of the type here involved. Where the person using it is careless, serious consequences occur. The manufacturer adopted a design to minimize danger and still accomplish the work. The plaintiff's evidentiary showing was merely the occurrence of other injuries, which served to prove nothing other than to confirm common knowledge. The plaintiff's expert stated a post hoc conclusion that it was theoretically probable that a different design would have been feasible and would have prevented the harm. "Proof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's

or seller's duty as to the design of the product." 63 Am.Jur.2d, Products Liability, section 73, page 79.

▇▇ The evidentiary showing conclusively demonstrates that the product conformed to the design as to safety developed by the industry. There was no attempt to claim that the theoretical design arrived at by the plaintiff's expert after the accident was known or available prior to or at the time of the accident or that common knowledge and ordinary judgment would have recognized as unreasonably dangerous the design uniformly adopted by the industry. This is not a case of custom, defective parts, or failure to inspect and test. We think the record conclusively established the absence of sufficient evidence to raise a justiciable issue of reasonable care under the circumstances by the manufacturer. The child's father was doubtless negligent as a matter of law. His negligence was the sole legal cause of the harm.

The judgment is affirmed.

PALMORE, C. J., and MILLIKEN, OSBORNE, REED, STEINFELD and STEPHENSON, JJ., sitting.

All concur.

OSBORNE, J., files separate concurring opinion.

OSBORNE, Justice (concurring).

It is my opinion this court went overboard in Dealers Transport Co. v. Battery Distributing Co., Ky., 402 S.W.2d 441. when it not only adopted the doctrine of strict liability but extended it further than had been recommended by its strongest advocates. All of my reasons are set forth in a dissent in Kroger Co. v. Bowman, Ky., 411 S.W.2d 339.

I concur in the majority opinion here because I believe it has the force of bringing the doctrine back into reasonable bounds and applying a logical rule of law.

I pointed out in my dissent in the Kroger case, supra, that where the doctrine is applied the plaintiff should carry the burden of proving:

1. Privity—that is by the purchaser or the one intended to be reached by the product.

2. Defective quality—not merely deficient for the consumers use.

3. That the defect existed when the product was sold by the distributor or manufacturer.

4. That the product differs from other standard products on the market.

5. Sustain the burden of proof that the injury was caused by the defect in the product and that the defect existed when the product left the hands of the defendant in the action.

I believe the majority in this case is realistic in saying that the plaintiff must fail because the proof did not show that the product differed materially from other standard products on the market.

For the above reasons stated, I concur in the majority opinion.