106 F.3d 401
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Kenneth and Karen LAIR, Plaintiffs-Appellants,
Reliance Insurance Co., Intervenor-Appellant,
v.
UNITED STARTING GATES CORP. and United-Puett Electrical
Starting Gate Corp., Defendants-Appellees.
 No. 95-6583.
 United States Court of Appeals, Sixth Circuit.
 Jan. 23, 1997.
 
 Before: MERRITT, BROWN, and NELSON, Circuit Judges.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is a product liability case in which the plaintiffs appeal from a summary judgment in favor of the designers/lessors of a race track starting gate. Brought in federal court on diversity grounds, the case is governed by Kentucky law.
 
 
 2
 We have been asked to decide two issues: (1) whether the district court erred in holding that the doctrine of strict liability does not extend to lessors; and (2) whether the district court erred in holding that the alleged design defect in the starting gate was sufficiently obvious to obviate any duty to warn of potential danger. After the submission of the case for decision by our panel, we requested supplemental briefing on a third issue: whether a jury could have been permitted to find that there was a design defect in the gate.
 
 
 3
 Upon de novo review of the record and consideration of the briefs and arguments of the parties, we conclude that the plaintiffs have not shown that there was a jury question as to the existence of a design defect. This conclusion makes it unnecessary to decide whether Kentucky's strict liability doctrine can be applied to lessors. We also conclude that the defendants had no duty to warn in this case, the allegedly dangerous configuration of the starting gate being obvious to any user of the gate. The judgment in favor of the defendants will be affirmed.
 
 
 4
 * The defendants (referred to collectively as "United-Puett") designed a 14-horse starting gate which they leased to the Churchill Downs race track in Louisville, Kentucky. Manufactured in 1962, the gate was in continuous use by Churchill Downs for nearly 30 years before the accident complained of here. United-Puett refurbished the gate between the 1990 Fall meet and the 1991 Spring meet, and at the time of the accident--April 30, 1991--it was in excellent repair.
 
 
 5
 Plaintiff Kenneth Lair had worked at Churchill downs as an assistant race starter for some 20 years before the accident. Mr. Lair was responsible for putting horses in the starting gate and keeping them calm as they waited to race. In carrying out his duties he would climb into a starting gate stall, or "hole," with his assigned horse and would gentle the animal while standing on a narrow ledge, or "pontoon," at the side of the stall. He had been doing this nine times a day, six days a week, 13 or 14 weeks a year, since 1971.
 
 
 6
 On the day of the accident Mr. Lair was told to put a particular horse in hole number one, the stall at the far left side of the gate. While Mr. Lair was standing on the pontoon inside the stall, petting his horse and talking to him, the animal in the next stall "threw a fit" and started kicking Mr. Lair's horse under the gate. That horse reacted violently, hitting Mr. Lair in the head and knocking some of his teeth out.
 
 
 7
 Although dazed by the blow, Mr. Lair tried to back out of the stall. His testimony indicates that he bumped into one or both of two steel crossbars that formed part of the internal bracing system on the left side of the starting gate. Unable to climb over the crossbars, Mr. Lair fell to the ground and was seriously injured by the horse.
 
 
 8
 With his wife, who asserted a loss of consortium claim, Mr. Lair sued United-Puett for damages. Reliance Insurance Company, the Churchill Downs workers' compensation carrier, intervened to protect its subrogation interest.
 
 
 9
 United-Puett moved for summary judgment following discovery. In an opinion and judgment order entered on March 25, 1994, the district court (Meredith, J.) granted the motion with respect to claims sounding in breach of warranty, strict liability,[1] and negligent design. Summary judgment was denied as to the sole remaining claim, one implicitly alleging a negligent failure to warn.
 
 
 10
 United-Puett subsequently filed a new motion for summary judgment on the failure to warn claim. The motion was denied. After further discovery, however, United-Puett moved the court to revisit the issue on the basis of alleged admissions by Mr. Lair that the cross-bracing of the starting gate did not constitute a latent defect. On October 31, 1995, the district court (Simpson, J.) granted the motion and dismissed the complaint with prejudice. A notice of appeal was then timely filed.
 
 II
 
 11
 We turn first to the plaintiffs' strict liability claim. Kentucky has long imposed strict liability in tort on manufacturers and distributors who sell products "in a defective condition unreasonably dangerous to the user or his property...." Dealers Transport Co. v. Battery Distr. Co., 402 S.W.2d 441, 446-47 (Ky.1966), citing Restatement (Second) of Torts § 402A (1964). Whether a product is defective for purposes of the strict liability doctrine depends on whether the product creates such a risk of accident that "an ordinarily prudent company engaged in the manufacture [of the product] would not have put it on the market." Nichols v. Union Underwear Co., Inc. 602 S.W.2d 429, 433 (Ky.1980). Bearing on this question are factors such as "the feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the product's inherently unsafe characteristics...." Montgomery Elevator Co. v. McCullough, 676 S.W.2d 776, 780 (Ky.1984).
 
 
 12
 Under certain circumstances there is a statutory presumption of non-defectiveness. Since 1978, Ky.Rev.Stat. 411.310(1) has provided as follows:
 
 
 13
 "In any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the subject product was not defective if the injury, death or property damage occurred either more than five (5) years after the date of sale to the first consumer or more than eight (8) years after the date of manufacture."
 
 
 14
 Once the presumption arises, liability for harm caused by the product may not be imposed unless the presumption is overcome by a preponderance of evidence. See Ingersoll-Rand Co. v. Rice, 775 S.W.2d 924, 927 (Ky.Ct.App.1989).
 
 
 15
 In the case at bar the injury occurred twenty-nine years after the starting gate was manufactured. Accordingly, the gate must be presumed to have been nondefective absent a preponderance of the evidence to the contrary. As a matter of law, we believe, the presumption stands unrebutted in this case.
 
 
 16
 The plaintiffs rely on the deposition testimony of Dr. Thomas Fenske, a structural engineer and academician who testified as an expert witness. Dr. Fenske described the framing system as a "space frame" with two components relevant here: the "interior bracing" that impeded Mr. Lair in his attempt to escape from the bucking horse, and "back bracing" of similar design located a short distance to the left of the interior bracing. If the back bracing had been made of heavier material, Dr. Fenske testified, the interior bracing would not have been necessary--and without any interior bracing, it would have been easier for Mr. Lair to get away from the horse.
 
 
 17
 Dr. Fenske acknowledged that he knew nothing about the state of the art in starting gate design when this particular gate was built in 1962. He noted that later designs dispensed with the interior bracing, however, and he expressed the opinion that for about $1500 it would have been possible to redesign the Churchill Downs starting gate, replace the back bracing with heavier stock, and remove the interior bracing. United-Puett's failure to upgrade the starting gate in this fashion constituted bad engineering practice, according to Dr. Fenske.
 
 
 18
 Under Kentucky law, however, the fact that a product could have been designed in a way that would have prevented a plaintiff's injuries is not by itself enough to show that the product was defective. In Rice the plaintiff had been severely injured by the rotary head of a mobile oil drill rig. The manufacturer of the rig was sued on a theory of strict liability. Although the plaintiff's expert testified that the rig in question was an "accident waiting to happen," 775 S.W.2d at 928, the Rice court found that unless the plaintiff could "present something more than a conclusion that it was theoretically probable that a different design would have been feasible and would have prevented [the plaintiff's] injury, we are of the opinion that the issue of strict liability should not be submitted to the jury." Id. at 929.
 
 
 19
 The Kentucky Court of Appeals has reached a similar conclusion in a negligence action. In Jones v. Hutchinson Mfg., 502 S.W.2d 66 (Ky.Ct.App.1973), a child sued the manufacturer of a grain auger after an accident in which the machine severed part of her left leg. The plaintiff's expert testified that the auger could have been designed with a shield to prevent hands and feet from slipping into the revolving blade of the auger. Id. at 68. Nonetheless, the Jones court concluded that
 
 
 20
 "[p]roof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's or seller's duty as to the design of the product." Id. at 70-1, quoting 63 Am.Jur.2d, Products Liability, § 73.
 
 
 21
 Rice and Jones demonstrate that standing alone, the fact that a product could be redesigned to improve its safety does not establish the existence of a design defect. Because the plaintiffs in the case at bar can show at most that it would have been possible to redesign the starting gate in a way that might have made it easier for Mr. Lair to escape from the horse, the plaintiffs cannot overcome the statutory presumption that the gate was defect-free. It would thus have been improper to submit the strict liability claim to the jury.
 
 III
 
 22
 We shall assume, without so deciding, that a product's being defect-free for strict liability purposes does not necessarily foreclose liability for negligent failure to warn. On this assumption, we conclude that United-Puett cannot be held liable for failing to warn Mr. Lair about the danger posed by the plainly visible cross bracing.
 
 
 23
 As the Kentucky Supreme Court said in Montgomery Elevator Co. v. McCullough, 676 S.W.2d 776, 782 (1984), quoting with approval from Minert v. Harsco Corp., 26 Wash.App. 867, 874, 614 Pac.2d 686, 691 (1980), "the manufacturer has a duty to warn the ultimate user of any dangers in its product (other than those that are open and obvious )." (Emphasis supplied.) Cf. Hutt v. Gibson Fiber Glass Prod., Inc., 914 F.2d 790, 793 (6th Cir.1990), where, applying Kentucky law, we noted that "[t]here is no duty to warn the user of a product when the user is aware of the product's danger."
 
 
 24
 The danger complained of in the case at bar was that the cross-bracing at the side of the first stall might interfere with a race starter's quick egress from the stall in the event of an emergency. The district court held that this danger was "an open or obvious danger, not a latent danger." We agree.
 
 
 25
 That egress from the side of the stall would have been difficult was obvious from the fact that two clearly visible steel bars blocked the path. The bars were in no way hidden; their placement would have been immediately evident upon the most casual inspection of the starting gate. Mr. Lair was very familiar with the gate, as it happens, because he had climbed into it thousands of times over the course of two decades. He could see the cross-bracing every day that he worked with the gate. As a matter of law, neither Mr. Lair nor anyone else could mulct United-Puett in damages for failing to give warning of a configuration that, by its obviousness, constituted its own warning.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 Noting that Kentucky has not yet followed other jurisdictions in extending strict liability in tort to those in the business of renting products to others, the court declined to hold the doctrine applicable to anyone other than manufacturers and distributors engaged in selling products to others