**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0293n.06

Case No. 16-5284

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| STEPHEN and ALEXANDRIA SCANLAN, Individually and as Administrators of the Estate of Sawyer Scanlan, | ) ) ) ) ) | **FILED**<br>May 24, 2017<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF |
| SUNBEAM PRODUCTS, INC. d/b/a Jarden Consumer Products, | ) ) ) | KENTUCKY |
| Defendant-Appellee. | ) ) | OPINION |

BEFORE: SUTTON and STRANCH, Circuit Judges; STEEH, District Judge.[*]

STEEH, District Judge. This case asks the question whether a space heater was unreasonably dangerous as designed, such that the manufacturer should be held liable for consequences resulting from a foreseeable use. Stephen and Alexandria Scanlan, individually and as administrators of the estate of Sawyer Scanlan, brought this product liability action against Sunbeam Products, Inc., the manufacturer of the Model SFH111 space heater. The Scanlans alleged that the space heater was defective and unreasonably dangerous, causing the death of their son when it heated his room to an excessive temperature. The Scanlans also alleged Sunbeam violated the Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.170, by engaging in unfair, false, misleading, or deceptive acts or practices in the conduct of its trade or

---

[*] The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

commerce.   The district court granted summary judgment to the defendant on both claims. Because plaintiffs cannot show that defendant consciously disregarded a known risk of the alleged defects, we **AFFIRM** the district court's grant of summary judgment on the claimed violations of the Kentucky Consumer Protection Act.   When viewed in the light most favorable to plaintiffs, a material issue of fact precludes summary judgment on the claim that the heater was unreasonably dangerous because of a defective design; thus we **REVERSE and REMAND** for further proceedings.

## I.   BACKGROUND

In December of 2010, Stephen Scanlan purchased a Sunbeam fan-forced heater, Model SFH111 ("SFH111"), for less than $20.   Mr. Scanlan could not remember if he fully read the instructions because he "knew how to operate an electric space heater," but he may have "glanced over" them and read the box.  R. 83-3 at 143.  On the night of December 15, 2016, Mr. Scanlan put his two-and-a-half year old son Sawyer to bed in his crib at approximately 9:00 p.m. The bedroom was ten feet by eleven feet and had one window which was covered in plastic to provide insulation.   Mr. Scanlan had used the heater on previous nights, but this night was colder, so he turned the thermostat dial "up a tiny bit" to the mid-range.  *Id*. at 24-25, 27.  After setting the heater, Mr. Scanlan closed the door to Sawyer's bedroom.  *Id*. at 36.

Mrs. Scanlan got up several times during the night to feed the couple's infant.  R. 85-4 at 58.  She listened for Sawyer, who was in the next room, but did not hear anything.  *Id*. at 65. Nobody opened the door to Sawyer's bedroom until the next morning around 10:00 a.m., when Mrs. Scanlan entered Sawyer's room and found him unresponsive.  *Id*. at 66-67, 70-71.

EMS official Robert Thompson pronounced Sawyer dead on the scene.   Paramedic Angele Rarden noted in her report that the "room was very warm."  R. 93-1 at 3.  An autopsy

was performed and Sawyer's condition was found to be consistent with dehydration. The medical examiner concluded, "The death of this 2 ½ year-old male child, Sawyer Scanlan, is attributed to heat exposure due to confinement in a small room with an electric space heater." R. 52-7 at 8.

On the top of the SFH111 are two dials. The right dial is the Mode Control, which enables a user to switch between off, "low heat" at 1000 watts, "high heat" at 1500 watts, and the fan-only setting without heat output. R. 81-8 at 3. The left dial is the Thermostat Control, also referred to as the auto-shutoff mechanism, which consists of a bimetal thermostat called the Tower A349. This dial can turn 270 rotational degrees and is marked with 10 progressively larger dots and a picture of a thermometer. *Id.*

The instruction manual for the SFH111 instructs the user to start the heater by turning the Thermostat Control fully clockwise to the highest position, or the largest dot. When the desired room temperature level is reached, the user is instructed to turn the Thermostat Control counter-clockwise toward the lowest position, or the smallest dot, stopping when the fan stops operating. At this point, the heater's thermostat is set to automatically maintain the chosen temperature level by cycling off and on. *Id.*

The instruction manual provides the following cautions:

When using electrical appliances, basic safety precautions should always be followed to reduce the risk of fire, electric shock, and injury to persons, including the following:

1.  Read all instructions before using this heater.

. . . .

6.  Extreme caution is necessary when any heater is used by, or near children or invalids, and whenever the heater is left operating and unattended.

. . . .

*Id.* at 2.

Mr. Scanlan did not rotate the Thermostat Control to the highest setting and wait for Sawyer's room to reach the desired comfort level, then lower the Thermostat Control until operation ceased, as directed in the instructions. Rather, Mr. Scanlan started the SFH111 with the Thermostat Control at the mid-range and left the room with the heater operating and the room still warming. R. 83-3 at 27-29.

The instruction manual does not warn against risks resulting from exposure to ambient heated air from the SFH111. The space heater itself does not display any instructions or warnings. The SFH111's box says it is "Best Suited for Active Homes (cool to the touch)." R. 91-14 at 1. The box has two pictures of young children. *Id*. at 2. The box advises that the space heater has an "Auto Shut Off" and that the "unit automatically turns heater off if it over heats." *Id*. at 1. Between 2004 and 2010, defendant and its successor The Holmes Group manufactured and sold 4,657,360 SFH111 and HFH111[1] heaters. R. 81-19 at 1. Defendant has no record of any other complaints "about a personal injury or death resulting from exposure to heated ambient air from this product model." R. 81-7 at 11.

Plaintiffs filed their complaint in Jefferson County Kentucky Circuit Court, and defendant removed the case to the United States District Court for the Western District of Kentucky, invoking the court's diversity jurisdiction. 28 U.S.C. §§ 1332, 1441 and 1446. Plaintiffs alleged that the SFH111 was defective and unreasonably dangerous as its auto shut off malfunctioned, allowing the heater to operate continuously and heat Sawyer's room to "increasingly fatal temperatures," causing Sawyer to die from heat exposure. R. 45 at 3. Among plaintiffs' theories of liability was that the heater was defective because defendant failed to adequately warn consumers of the danger presented in the ordinary and foreseeable use of the

---

[1] The SFH111 and HFH111 have different model numbers but they are technologically the same product.

4

SFH111. *Id*. at 5. Plaintiffs further alleged that defendant violated the Kentucky Consumer Protection Act "by engaging in unfair, false, misleading, or deceptive acts or practices in the conduct of trade or commerce." *Id*. at 9.

In granting defendant's motion for summary judgment, the district court concluded that Sunbeam was entitled to a presumption under Kentucky law, Ky. Rev. Stat. § 411.310(2), which presumes a product not to be defective where it conforms to the generally recognized and prevailing industry standards at the time of manufacture. The court then held that the plaintiffs had not shown a genuine issue of material fact concerning whether the SFH111 was unreasonably dangerous, such that an ordinarily prudent manufacturer would not have put it on the market.

As for the failure to warn theory, the court found that the plaintiffs failed to establish a genuine issue of material fact that Mr. Scanlan would have behaved differently if the instruction manual, the box, or the space heater itself had a warning regarding the ability of the SFH111 to heat a room to very high temperatures. The district court reasoned that Mr. Scanlan admitted he did not pay close attention to any of those items since "he already knew how to operate an electric space heater." R. 113 at 18. The experts all agreed that if Mr. Scanlan had followed the directions provided with the heater "and turned down the Thermostat Control after the room reached a comfortable temperature, Sawyer likely would have survived." *Id*. at 19-20. For this reason, the court concluded that a failure to warn did not lead to Sawyer's death.

Finally, the court granted defendant's motion for summary judgment on plaintiffs' Kentucky Consumer Protection Act claim, holding that "Plaintiffs have not alleged facts upon which a reasonable jury could find Sunbeam intentionally, knowingly, or in bad faith took malign actions affecting the Plaintiffs." *Id*. at 21.

Plaintiffs timely filed this appeal.

## II.     ANALYSIS

This Court conducts a *de novo* review of the district court's grant of summary judgment. *Thom v. Am. Standard, Inc.*, 666 F.3d 968, 972 (6th Cir. 2012).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448-49 (6th Cir. 2012) (citation omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a properly supported motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*. at 449 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  "In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

## A.  Kentucky's Statutory Presumption

Under Kentucky law, manufacturers are entitled to a presumption that their product is not defective if "the design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured."  Ky. Rev. Stat. § 411.310(2).  If the presumption applies, liability for harm caused by the product may not be imposed unless the presumption is overcome by a preponderance of evidence.  *Id*.;  *Ingersoll-Rand Co. v. Rice*, 775 S.W.2d 924,

928 (Ky. App. 1989). With or without the presumption, the burden of showing that the product is defective is borne by plaintiffs.

Underwriters Laboratories ("UL") tested the SFH111 and found it to be in compliance with multiple manufacturing, design and testing standards set out in UL 1278, which is a safety standard for moveable and wall- or ceiling-hung electric heaters. UL 1278 requires quality testing on things such as power input, wattage, RPM, noise level, motor temperature, start-up voltage, voltage withstand, and leakage current. R. 91-16 at 114-15. Testing examines the temperature of the cord, knobs and the exterior surface of the heater and grill when the heater is used correctly. Testing is also done on some abnormal use, such as cord strength when the heater is carried by the cord. *Id*. Further testing includes "continuous on" which leaves the heater running for 1000 hours to see if it still operates correctly, and cycle testing which turns it on and off while looking for expansion and contraction of connections as the unit heats and cools. *Id*. at 115, 118. The terry cloth drape test makes sure the heater turns off if a consumer tries to dry fabric on the unit. *Id*. at 116. The heater is placed against a wall to see if it shuts off. *Id*. at 87. The packaging is tested for its ability to protect the heater if the box is dropped. *Id*. at 116. Testing is done on the thermostats and heater cutoff for quality assurance and proper performance. *Id*. The adjustable thermostat accuracy test checks for accuracy of the room temperature as the heater cycles on and off. *Id*. at 119. The plaintiffs' expert, William Murphy, agreed that the heater met or exceeded the requirements of UL 1278. R. 81-10 at 142.

All of the UL 1278 tests are concerned with general performance and safety of the heater in terms of fire, burns, shock and other injuries to the consumer as the heater is typically used or misused by the consumer. While UL 1278 tests the performance of the thermostat, it does not require testing to determine whether the heater will overheat a space to a dangerously hot

temperature. R. 91-13 at 4340-41. Mr. Vernaglia, project engineer of the SFH111, explained that there is no compliance body or standard that tests the ambient temperature in a room when a heater is being used because it is up to the user to determine the desired temperature. R. 91-16 at 125.

Even though UL 1278 does not test for a heater's ability to overheat a room, it is generally considered to be the recognized safety standard for portable space heaters. While there may be more than one safety standard, plaintiffs have not identified another standard that would have required testing of a heater's effect on the ambient temperature of a room. Therefore, the statutory presumption that the SFH111 was not defective applies. Furthermore, the district court correctly applied the statutory presumption in this case by giving plaintiffs the opportunity to rebut the presumption with a showing by a preponderance of the evidence that the space heater was defective. *Boon Edam, Inc. v. Saunders*, 324 S.W.3d 422, 432 (Ky. Ct. App. 2010) (citing *Leslie v. Cincinnati Sub-Zero Prods., Inc.*, 961 S.W.2d 799, 803 (Ky. Ct. App. 1998)); *Murphy by Murphy v. Montgomery Elevator Co.*, 957 S.W.2d 297, 300 (Ky. Ct. App. 1997).

## B. Defective Design

### 1. Unreasonably Dangerous Product

Where a manufacturer is accused of designing a defective product, whether under a strict liability or negligence theory, the consumer must prove that the product was unreasonably dangerous. *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 839 (E.D. Ky. 1998); *Worldwide Equip. Inc. v. Mullins*, 11 S.W.3d 50, 55 (Ky. Ct. App. 1999). The test in Kentucky presumes that the manufacturer knows the qualities and characteristics of the product, and asks whether the product creates "such a risk" of an accident of the general nature of the one in question "that an ordinarily prudent company engaged in the manufacture" of such a product "would not have put

8

it on the market." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984) (quoting *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980)).

Plaintiffs' product liability claim alleges that the SFH111 had a defective design because it was capable of heating a room to temperatures "incompatible with human life." The "comfort zone" for normal human activity is considered to be roughly 60 to 80 degrees Fahrenheit. R. 91-11 at 99. Expert testimony in this case clearly establishes that the SFH111 can heat a small room to a very high temperature, above 100 degrees Fahrenheit, if the user turns the Temperature Control to mid-range and does not turn the Temperature Control down. The question is whether the heater's ability to heat a small room to temperatures in excess of 100 degrees when used in this manner, given its advertising and warnings, makes the SFH111 unreasonably dangerous such that a prudent manufacturer would not have put it on the market.

In order to evaluate whether the SFH111 was defective, one must understand how the Tower A349 thermostat was designed to work. The Tower A349 is a bimetal thermostat, and it is the only component in the SFH111 that the Scanlans argue is defective.[2] A bimetal is a strip or coil of two metals attached to one another that expand at different rates as temperature increases. The two metals' different rates of expansion lead the bimetal strip or coil to bend, allowing the bimetal to act as a circuit breaker. When the internal temperature of the heater rises to a certain level, the bimetal will bend enough to create a gap in the heater's circuit, causing it to turn off. When the temperature cools enough for the bimetal to return to its original position, it reconnects the circuit loop, causing the heater to resume blowing heated air. The Thermostat Control (the dial with the picture of a thermometer) does not set the external air temperature of the room because the SFH111 does not have a thermometer that measures external air

---

[2] While the Tower A349 is the only component the Scanlans identify as defective, they also point to the design of the SFH111 as a whole, including information contained on its packaging and in its operating manual.

temperature. Instead, the Thermostat Control sets the internal temperature at which the bimetal breaks the circuit and thus engages the auto-shutoff mechanism.

The A349 schematic the Scanlans present as evidence links the angle of the Thermostat Control with the temperature threshold of the bimetal at which the circuit will be broken. Sunbeam's liability expert Robert Miller ("Miller") explained that the Thermostat Control dial operates linearly. In the case of the SFH111, this means that each of the ten dots on the Thermostat Control dial represents a 15 degree increase in temperature on the bimetal. For example, Dot 5 corresponds to a bimetal threshold of approximately 128 degrees; when the dial is turned to Dot 7, the A349 sets the threshold at 158 degrees. These are internal temperatures of the bimetal, not the external air temperature of the room.[3] The Scanlans argue that the A349 schematic itself provided Sunbeam with all the data it needed to calculate the room temperature at which the heater would stop heating at each dot setting on the Thermostat Control.

Miller explained that there is a reason why the type of thermostat used by the SFH111 and other heaters permit very high temperature ranges on the bimetal. The temperature on the bimetal will be higher than the general temperature in the room because the resistive heat from current flowing through the thermostat component "can cause a 45°F temperature rise on the body of the thermostat bimetal, with no other heat sources contributing to the temperature rise." R. 79-7 at 12-13, 17. Resistive heat is impacted by the voltage of the outlet, duration of use, and the wattage chosen by the user. These additional sources of heat are factors that help explain why bimetal thermostats are calibrated to temperatures far above what users want as their room temperatures. In addition, small space heaters of this type are used in a wide variety of settings.

---

[3] The A349 schematic labels the temperatures as room temperatures, but as the court understands the operation of the thermostat in the SFH111 as only measuring temperature using the bimetal, it only makes sense that the diagram must be referring to the temperature on the bimetal.

*Id*. at 6, 13.  They are used in small rooms where it is possible to heat the whole room to roughly the same temperature.  They are also used in large spaces and in semi-enclosed spaces where the ambient temperature immediately around the heater may be far higher than the overall room temperature.  The utility of a heater with a high range and a flexible thermostat was demonstrated by Miller when he tested the SFH111 under a desk.  The temperature behind the heater rose to over 125 degrees, causing the heater to cycle off at Dot 8 ¾, while the temperature three feet away remained at 64 degrees.  *Id*. at 19.

Prior to Sawyer's death, defendant did not test how hot the SFH111 could make a room.  R. 91-13 at 4.  After the Scanlans brought this lawsuit, Miller tested a SFH111 in Sawyer's room.  When the heater was turned on with the Temperature Control set on Dot 7, the space heater ran continuously without cycling off.  R. 91-11 at 71-72.  After six hours, the temperature in the room was almost 110 degrees mid-way up a wall, 115 degrees on the slanted section of ceiling above the crib, and 120 degrees six inches off the ceiling in the center of the room.  *Id*. at 72.  Miller testified that he had never before seen a heater heat a room to 120 degrees.  *Id*. at 236.  As discussed below, Miller conducted testing on other heaters, both in connection with being hired as an expert for this lawsuit, as well as in his previous employment.  On appeal the Scanlans argue that, assuming the other heaters Miller tested also operated linearly, they would have only heated Sawyer's room to 77 degrees if their temperature control was set at seventy percent, as opposed to 120 degrees when the Temperature Control on the SFH111 was set at seventy percent.

The overarching question is whether an ordinarily prudent company would have put the SFH111 to market, while advertising it as having overheat protection and auto shut-off features, with no warnings or instructions on the heater itself and without any warnings that it can heat a

room to deadly conditions if left on a middle setting. Under Kentucky law, factors bearing on the question whether the product was manufactured "in a defective condition unreasonably dangerous" include whether there is a feasible alternative design, the obviousness of the danger, the adequacy of warnings and instructions, misuse, subsequent maintenance and repair, ordinary customer expectations, and the product's inherently unsafe characteristics. *McCullough*, 676 S.W.2d at 780-81; *Nichols*, 602 S.W.2d at 433. The facts of an individual case will determine which factors are relevant to the decision whether a product is unreasonably dangerous. *Id*. Ultimately, the factors are considered together in making this determination.

### a. Industry Custom or Practice

Sunbeam's expert Miller performed a Comfort Level Test in which he examined the Holmes HFH111[4] space heater with the A349 thermostat, as well as the same heater with a different comfort thermostat, and five similarly constructed competitor 1500 watt fan heaters equipped with adjustable comfort thermostats. The Comfort Level Test ran each heater for one hour in a small enclosed room on the highest heat setting with the thermostat set at the highest position. After one hour the thermostats were turned down until the heaters cycled off. The heaters continued to run, cycling on and off, for two more hours. Then the heaters were turned back to the highest setting and allowed to run for two more hours. Miller concluded that the "results demonstrate that the two Sunbeam heaters perform similarly to the competitor heaters, and in fact produced lower room temperatures than four of those competitor heaters." R. 79-7 at 8.

Plaintiffs find support for their theory in the test results discussed by Miller while working for his previous employer, Lakewood Engineering & Manufacturing. At Lakewood,

---

[4] The Sunbeam SFH111 was renamed the Holmes HFH111 but is technologically unchanged.

Miller was involved with testing Lakewood heaters against competitor heaters. Miller testified that testing took place only a few times during the 23 years he was employed at Lakewood, the first time around 2000 and the last time in 2005. Miller's testimony at his deposition was based on his recollection almost 10 years later. Each heater was tested by putting it in a small unused sauna that was on the Lakewood property and letting it run for at least five hours with the thermostat fully open. The purpose of the test was to compare the efficiency of the 1500 watt heaters made by Lakewood and those of its competitors. To the best of Miller's memory, the maximum room temperature that was achieved by any of the heaters tested by Lakewood was in the "general area" of 110 degrees Fahrenheit. R. 91-11 at 243.

The Lakewood testing was conducted in a small sauna, which Miller testified was better insulated than Sawyer's bedroom. *Id.* at 244. Therefore, one would expect that if the SFH111 had been tested in the Lakewood sauna on Dot 7, it would have heated the ambient air to more than the 110-120 degree temperatures measured by Miller in Sawyer's room before turning off.

To be sure, there are weaknesses in the Scanlans' reliance on the Lakewood testing. For starters, the 110 degree figure came from Miller's general recollection almost a decade after the testing was last done, and the testimony is not supported anywhere else in the record. Nevertheless, Miller is defendant's expert, and because he conducted both tests and admitted facts tending to support plaintiffs' theories of liability, this evidence cannot be discounted as biased. Miller further testified that he had never seen another heater heat a room to 120 degrees, even in the ten years since he conducted the Lakewood tests.

The Lakewood tests were set up to test maximum heat output of heaters without being limited by an internal thermometer threshold like the A349 bimetal. The heaters were allowed to run for 5-8 hours. In contrast, Miller's controlled testing conducted for this lawsuit set the

thermostat to Dot 7, but only let the heaters run for two hours. While neither test compares similar heaters to the SFH111 under the same circumstances present in Sawyer's room, taken together the tests and Miller's testimony provide sufficient evidence for a jury to find that the A349 thermometer is defective for failing to shut off, when set at Dot 7, before the ambient temperature in the room reached 110-120 degrees.

A reasonable juror could conclude from this evidence that a heater that permits a room to reach 110-120 degrees when the dial is turned to Dot 7 is defective, while a heater that permits similar temperatures while on its maximum setting is not. This is because a consumer could foreseeably expect that the heater will heat a room to a lower temperature, and is therefore safer to use, at Dot 7 than at its maximum setting. Of course, consumer expectations are a relevant criterion under Kentucky law.

### b. Alternate Design

The feasibility of making a safer product is a factor that may inform whether an ordinarily prudent manufacturer would have placed the SFH111 on the market knowing that it can heat a room to a very high temperature. *McCullough*, 676 S.W.2d at 780-81. Plaintiffs in this case presented evidence of several alternative designs which they allege were safer, practical and feasible, and which would have prevented the death of Sawyer.

First, defendant could have used a digital thermometer to limit a room's ambient temperature to between 60 and 80 or 85 degrees. Plaintiff's expert witness, safety engineer Craig Clauser, opined that the heater could have been designed such that the highest setting would cause shut off when incoming room temperature air was at 85 degrees and the lowest setting would cause shut off when incoming air temperature was at 60 degrees. For this to work, the housing around the thermostat would have to be opened to expose the bimetallic strip directly

to the incoming air from the room as opposed to air from inside the heater, and the thermostat would have to be shielded from radiant heat from the coils. R. 52-4 at 6. Installing a digital thermostat would have cost between $1.00 and $1.50 per unit. R. 91-24 at 59. Plaintiffs suggest that defendant's own SFH442 was a similarly sized and priced space heater that used such a digital thermometer. According to Miller, if a user turned the thermostat dial to the half-way point, the SFH442 would heat a small room to an ambient temperature of 70 degrees Fahrenheit. R. 91-11 at 99. In comparison, the SFH111 heats the bimetal inside the heater to 128 degrees Fahrenheit when its analog thermostat is rotated halfway. *Id*. at 99-100. We know from testing done in this case that the corresponding ambient air temperature of a small room heated by the SFH111 set at Dot 7 can range from 110-120 degrees Fahrenheit.

Other potential changes described by plaintiffs' experts include designing the bimetal thermostat to turn off at an internal temperature less than the 212 degrees incorporated in its current design, R. 91-25 at 24; R. 91-20 at 57, or by using lower wattage, which would have the effect of lowering the temperature range. R. 91-17 at 226-27. Alternatively, the packaging could have been designed to avoid misleading claims. Plaintiffs' expert William Murphy opined that the presence of a thermostat and the claim of "overheat protection" on the package "would indicate to some users that they need not constantly monitor the room conditions since the thermostat will maintain temperature within a safe range, just as their central heating/cooling thermostat does." R. 52-2 at 7. The statement on the box, "**Auto Shut-Off** Unit automatically turns heater off if it over heats," is described by Mr. Murphy as at best ambiguous and unclear. "The manufacturer is referring to the safety limit reset switch with an operating temperature around 150°F. The consumer may interpret this overheating statement as referring to the thermostat control with a limit of 80-85°F like what they see on their central heat/cool

thermostat." *Id*. Defendant did not present any evidence disputing plaintiffs' expert testimony on alternative designs.

In granting summary judgment to the defendant manufacturer, the district court in *Fritz v. Campbell Hausfeld/Scott Fetter Co.* noted that "proof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's or seller's duty as to the design of the product." 2007 WL 1558509, *3 (E.D. Ky. 2007) (quoting *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 70 (Ky. 1973)). The expert witness in *Fritz* presented three different alternative designs to a pressure washer that he claimed would have prevented the plaintiff's injury. However, the expert said "nothing about industry standards or practices, the state of the art in the industry, similar accidents involving this or other products, or other factors relevant to the issue of whether the defendants' product is actually defective." *Id*. "[P]roof that technology existed, which if implemented would feasibly have avoided a dangerous condition, does not alone establish a defect." *Stewart v. Gen. Motors Corp*, 222 F. Supp. 2d 845, 848 (W.D. Ky. 2002) (quoting *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir. 1996)); *see also Wall v. Ford Motor Co.*, 983 F.2d 1071 (6th Cir. 1992) (unpublished) (expert testimony that it was possible to design the vehicle in a way that could have prevented plaintiff's injury was not enough to rebut the presumption, and "something more" was required).

The court considers the testimony of plaintiffs' experts regarding alternative designs as one factor among others in the analysis of whether the SFH111 was unreasonably dangerous such that defendant should not have put it on the market as designed.

### c. Adequacy of Warnings

Defendant's expert Miller compared the SFH111 to several similarly constructed space heaters which all contain "nearly identical warnings and instructions regarding heater use and adjustable thermostat operation." R. 81-20 at 2-3. None of the heaters he looked at "contained a warning concerning the potential for the product to produce excessive ambient temperatures during use or a warning regarding the dangers associated with raised temperature levels." *Id*. However, Miller did not test these other heaters for excessive ambient room temperature when they were set to Dot 7 and permitted to run overnight.

A warning might be adequate in some circumstances, but not in others. In light of the evidence supporting plaintiff's theory that the A349 Thermostat permits ambient temperatures to achieve levels of 100-120 degrees when the temperature control dial is set to the mid-range, a different warning may be required. This is all the more true given that the product's packaging fostered false expectations with regard to the presence of an adjustable thermostat and overheat protection, as discussed in the next section on consumer expectations. Stated another way, it is possible that the A349 thermostat is not inherently defective due to its ability to allow the bimetal to reach high temperatures before cycling off *if* adequate warnings are provided regarding reasonable misuse.

Specifically, the instruction manual fails to warn consumers that the A349 permits excessive temperatures at middle settings if the user does not properly calibrate the advertised auto-shutoff feature by turning the temperature dial to the left until the unit cycles off after a comfortable temperature has been achieved. A customer would have no way of knowing, even after reading the instructions, that setting the thermostat control to a middle level, rather than the maximum level as instructed, would have no differing impact on heat output.

### d. Consumer Expectations

Kentucky precedent states that a product fails to satisfy consumer expectations when it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it. *Greene v. B.F. Goodrich Avionics Sys.*, 409 F.3d 784, 789 (6th Cir. 2005) (citing Restatement (Second) of Torts § 402A cmt. i. (1965)). Miller's testing showed the SFH111 was capable of heating Sawyer's room to 115 or 120 degrees Fahrenheit without shutting off in six hours. R. 91-11 at 71-72. Plaintiffs' experts opined that consumers would not expect a space heater on a middle setting to heat a room far above the normal zone for human comfort of 65 and 84 degrees. R. 52-1 at 6-7; R. 52-3 at 19. Dr. Lehto, plaintiffs' human factors expert, testified that ordinary consumers would be "shocked" to learn that a space heater can warm a room to the point that a person would succumb to heat stroke. R. 91-18 at 140-41. William Murphy, plaintiffs' engineering expert, testified that most consumers would expect a heater would have an upper range of 80-85 degrees, similar to what they are used to seeing on their central heating/cooling thermostat. R. 91-13 at 3. In short, consumers would not expect a heater left unattended on a middle setting to cause risk of death due to heat exposure, as opposed to a different type of danger such as shock or fire.

The packaging of the SFH111 only bolsters these false consumer expectations. The small room designation appearing on the box implies that defendant offered different products depending on room size. In fact, all of defendant's heaters were 1500 watts on the higher wattage setting, regardless of whether it was a small heater or a large heater. R. 91-20 at 37-38; R. 91-21 at 142. Photographs of families on the box imply the SFH111 is safe for active homes. The advertised safety features including an adjustable thermostat, overheat protection and auto shutoff could likely lead a reasonable consumer to believe that excessive ambient temperature is

not a risk with this product. Finally, the dots of increasing size on the heater's dial suggest one could rely on the dial placement to control ambient room temperature according to the preferences of the consumer. R. 91-11 at 271-72 ; R. 91-18 at 80-81, 103-04, 113-15. Defendant did not produce any evidence to contradict plaintiffs' evidence regarding consumer expectations.

In this case, a failure to warn and consumer expectations go hand in hand. Consumers use products in the ways those products are marketed and labeled. The adequacy of warnings may depend on whether marketing-driven consumer expectations lead consumers to unexpectedly dangerous uses without fair warning. For example, plaintiffs' expert stated that "safety terms, such as 'overheat protection' . . . may result in a user being less careful about how they operate the unit if they feel it has such protections built into the product." R. 52-2 at 8. In other words, a warning may be more inadequate than otherwise if a product's inherent nature or the seller's chosen marketing leads consumers to expect that certain uses are safe.

### e.  Conclusion on Unreasonably Dangerous Product

Defendant would have this court hold that their compliance with industry custom is dispositive in this case. Defendant emphasizes the uncontroverted evidence that Sunbeam has received no similar complaints in the last fifteen years, during which it sold 18 million heaters with similar or identical bimetal thermostats to support its argument that the SFH111 conforms to a common and overwhelmingly safe design. R. 79-7 at 5.

However, there is no precedent for finding that compliance with industry custom can be dispositive. This is supported by the fact that Kentucky courts allow a jury to find a product defective despite compliance with industry standard. *See Jones*, 502 S.W.2d at 70 ("[I]f an industry adopts careless methods, it cannot be permitted to set its own uncontrolled standard. . . .

Where common knowledge and ordinary judgment will recognize unreasonable danger[,] what everyone does may be found to be negligent."); *Boon Edam, Inc. v. Saunders*, 324 S.W.3d 422, 429 n.13 (Ky. Ct. App. 2010) ("A curious argument which basically reasons that because no one was previously injured there must not be any danger arising from the operation of the door. If accepted, a corollary would be there could never be an injury caused by the operation of the door in the first instance because there had never been a prior injury. This is simply an untenable argument.").

All of the considerations discussed in *McCullough* and analyzed above are factors bearing on the principal question whether the SFH111 was manufactured "in a defective condition unreasonably dangerous." In rare cases the Kentucky Supreme Court has found one of those factors dispositive as a matter of law. For example, the patency of the danger of a grain auger made it unreasonable to hold a manufacturer liable for an injury caused by the circumstances in which the product was used; the consumer's subsequent failure to maintain a disintegrating grinding wheel was the sole cause of injury and the original design was not a contributing factor; and the inherently unsafe characteristics of dynamite made it unreasonable to blame the manufacturer for a failure to warn of the dangers due to careless handling. *McCullough*, 676 S.W.2d 776, 781 (Ky. 1984) (citing *Jones*, 502 S.W.2d 66 (grain auger); *Ulrich v. Kasco Abrasives Co.*, 532 S.W.2d 197 (1976) (grinding wheel); *Hercules Powder Co. v. Hicks*, 453 S.W.2d 583 (1970) (dynamite)). There is no compelling argument under the circumstances of this case that any one factor should be dispositive as a matter of law. The space heater at issue does not pose a risk of danger comparable to the grain auger, was not negligently maintained like the grinding wheel and would arguably benefit from a well-placed warning, unlike the dynamite in *Hercules Powder*. By statute, complying with industry practice entitles a

manufacturer to a rebuttable presumption that its product is not defective. Making that presumption irrebuttable is solely within the province of the legislature.

A space heater's foremost and obvious danger is risk of shock or fire, not risk of producing fatal levels of ambient heat. Given the substantial evidence that the SFH111 provides inadequate warnings of a danger that defies consumer expectations for a reasonable use, this court cannot find that compliance with industry standard is dispositive in this case. The Scanlans presented evidence by multiple experts of inadequate warnings, consumer expectations, and alternative designs. Much of plaintiffs' evidence was not controverted by defendant. Kentucky law suggests that courts cannot find that evidence of compliance with industry custom alone outweighs evidence of these other factors. At trial, Sunbeam may argue that they and other manufacturers have sold millions of comparable heaters without incident and a jury may agree that compliance with industry custom outweighs the other factors. Such decisions rightly belong to a jury.

Kentucky law allows a fact finder to find a product defective despite industry compliance. A jury should be able to evaluate the weight of the evidence and determine if defendant manufactured a product which was unreasonably dangerous in design. Such a finding would not mean the industry standard is per se unreasonable. For example, if a jury found the SFH111 to be defective, Sunbeam might correct this defect by adding appropriate warnings clarifying that failure to turn the dial down until the heater cycles off upon reaching the desired temperature will result in continuous and potentially fatal heat output. Similarly, consumer expectations could be impacted by making changes to the product claims included on the packaging.

The court concludes the district court erred in taking the issue of whether the SFH111 was an unreasonably dangerous product away from the jury.

## 2. Failure to Warn

In Kentucky, "a product is unreasonably dangerous in design if it does not adequately warn the consumer that the product should not be put to a certain use." *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1149 (6th Cir. 1996) (citation omitted). Therefore, warnings and instructions are relevant in determining whether a product is defective. *Id.* This duty to warn "extends to the dangers likely to result from foreseeable misuse of a product." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1996). Where the manufacturer is obligated to give an adequate warning of danger, the giving of an inadequate warning is as complete a violation of its duty as would be the failure to give any warning. *Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 521-22 (Ky. 1968).

As evidence that defendant had reason to know the SFH111 was likely to be dangerous because it could heat a space to excessive temperatures, plaintiffs point to the schematic for the Tower A349 thermostat. R. 91-12. Based on the diagram, plaintiffs contend that defendant could have deduced that at its upper levels the SFH111 would produce excessive ambient temperatures. Despite possessing this evidence, the instruction manual contained no warnings about the associated danger, nor were there any relevant warnings on the heater itself. In addition, the packaging fostered false consumer expectations that the SFH111 had safeguards to prevent the danger of producing excessive ambient heat. Plaintiffs presented evidence from four experts who each concluded that a warning should have been placed directly on the heater to make consumers aware of the gravity of the risk of turning the Thermostat Control dial to a middle setting and leaving the heater running overnight. R. 91-18 at 135; R. 52-2 at Page ID

449-50; R. 52-3 at 17; R. 52-4 at 589. An adequate warning on the heater itself might have drawn Mr. Scanlan's attention such that he would not have left the heater turned on in a room occupied only by a sleeping child.

The district court erroneously placed the burden on plaintiffs to show that Stephen Scanlan would have behaved differently if the instruction manual, box or space heater itself contained a warning regarding the heater's ability to heat a room to very high temperatures. However, a plaintiff is not required to prove that a different warning would have averted the injury in question when the warning that was actually given was inadequate. "[I]n the absence of an adequate warning, the defendant cannot shift to the plaintiff the burden of proving that he would not have misused the product regardless." *Morales*, 71 F.3d at 537 (citing *Post*, 437 S.W.2d at 521)). Mr. Scanlan's failure to follow the operating instructions because he did not read them does not shift the burden to plaintiff to prove he would not have misused the product regardless of what instructions or warnings were provided.

Causation is an issue of fact, and all of the relevant facts should be considered. The fact that the warnings provided were embedded in the instruction manual and were not present on the heater itself is relevant. It is also relevant that while the instruction manual warned of the danger of shock and fire, nowhere did it warn of the danger associated with excessive ambient air temperature – the actual danger that caused the injury at issue. Plaintiffs should be able to argue to the jury that the warnings provided were inadequate, that the terms "adjustable thermostat" and "overheat protection" on the box were misleading, and that plaintiffs' expectations in their purchase and use of the heater were reasonably influenced by these factors.

## C. Kentucky Consumer Protection Act

In order to establish a violation of the KCPA, plaintiffs must show that the defendant's actions were either (1) intentional or (2) grossly negligent. *Sparks v. ReMax Allstar Realty, Inc.*, 55 S.W.3d 343, 348 (Ky. Ct. App. 2000). Gross negligence requires a "conscious and voluntary act or omission which is likely to result in grave injury when in face of clear and present danger of which alleged tortfeasor is aware." *Id*.

Plaintiffs argue on appeal that they established an issue of fact that defendant knew that the SFH111 could produce excessive ambient temperature based on the calculations appearing on the Tower A349 Diagram. The diagram shows that when the thermostat was turned 47 rotational degrees, the auto shutoff feature would not engage until the internal temperature of the bimetal reached 70 degrees Fahrenheit. The thermostat limit increased four degrees Fahrenheit for every six degrees of rotation. Therefore, a jury could find that defendant knew that the SFH111 was capable of producing excessive heat in the range of 128 degrees Fahrenheit on the bimetal at 135 rotational degrees – the setting used by plaintiffs on the night Sawyer Scanlan died. With this knowledge, plaintiffs marketed the heater for small rooms and families with children, advertising safety features that would mislead the consumer.

In order to show that defendant engaged in a conscious and voluntary act or omission in the design, manufacture or sale of the SFH111, plaintiffs must offer facts for the jury to find that defendant had knowledge of alleged defects *and* consciously disregarded such information. *See Dalton v. Animas Corp.*, 913 F.Supp. 2d 370, 378 (W.D. Ky. 2013). There is no evidence in the record from which a jury could find defendant consciously disregarded known hazards associated with the SFH111's heating capabilities. Sunbeam and its predecessor Holmes manufactured and sold 4,657,360 SFH111 and HFH111 heaters from 2004 and 2010 and never

received any notice of an alleged injury or death resulting from exposure to heated ambient air. R. 81-19 at 1. The plaintiffs simply have not alleged any facts upon which a reasonable jury could find that defendant intentionally, knowingly or in bad faith took malign actions affecting the Scanlans.

This court affirms the district court's grant of summary judgment on plaintiffs' Kentucky Consumer Protection Act claim.

## CONCLUSION

We **AFFIRM** the district court's grant of summary judgment on the claimed violations of the Kentucky Consumer Protection Act, **REVERSE** the district court's grant of summary judgment finding no issue of material fact as to whether the space heater was designed in a defective condition unreasonably dangerous and **REMAND** for further proceedings.

SUTTON, Circuit Judge, concurring. I concur in the court's thoughtful and admirable efforts to resolve this difficult case. But I must acknowledge the far-reaching nature of the court's holding that Kentucky tort law permits this claim to go to a jury. The pertinent question is whether an "ordinarily prudent company . . . would not have put [this product] on the market." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984). That standard takes account of many factors, but it necessarily emphasizes what ordinary manufacturers have always done. And in this case, the record establishes that the SFH111 was no different from the heaters with bimetal thermostats that numerous manufacturers have used "hundreds of millions" of times *over 50 years without a single comparable incident.* R. 79-7 at 5–6. Yes, an entire industry can be wrong. And yes, the fruits of its collective mistake can occur later. But this of course is not a latent injury case. In the context of such a common design and such an uncommon harm, it is difficult to see how a reasonable jury could retroactively condemn such a uniform practice as being unreasonably dangerous. But that apparently is what Kentucky tort law allows. I therefore concur in the court's opinion.